FILED

2024 Mar-28  AM 10:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| DAVID HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-cv-01115-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff David Hill filed for review of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits. Doc. 1. Plaintiff Hill applied for disability benefits with an alleged onset date of March 30, 2020. Doc. 8-4 at 3, 26; Doc. 8-6 at 2. The Commissioner denied Hill's claim for benefits. Doc. 8-3 at 5–9, 23–42. In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 13; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Hill argues that the court should reverse the Commissioner's

1

decision for two reasons:  (1) the Administrative Law Judge (ALJ) "failed to properly evaluate the opinion of consultative examiner Ashley Wagner, N.P."; and (2) the "ALJ's RFC determination concerning Plaintiff's substance abuse disorder and other mental impairments is not supported by substantial evidence as he failed to rely on any medical opinion and instead constructed the RFC out of whole cloth." Doc. 15 at 3.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:  (1) initial determination, including

reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)    whether the claimant is engaged in substantial gainful activity;

(2)    if not, whether the claimant has a severe impairment or combination of impairments;

(3)    if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)    if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)    if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018)

3

(quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).   If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act.  The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.**   With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835,

4

838 (11th Cir. 1982) (similar).  If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings."  *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding."  *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).  "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.**     With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.     Hill's personal and medical history

Hill was born on February 27, 1965.  Doc. 8-3 at 54.  He worked in logistics for the Army National Guard from August 2000 to March 2020.  Doc. 8-7 at 30.

In March 2018, Hill was medically referred for a substance abuse assessment

and treatment was recommended, but Hill declined.  Doc. 8-12 at 61, 65.

On March 1, 2019, Hill reported to Crestwood Medical Center in Huntsville, Alabama, with heart palpitations and arm pain and was diagnosed with atrial fibrillation (AFIB).  Doc. 8-8 at 8–14.  He reported drinking approximately a pint of vodka per day.  Doc. 8-8 at 13.  Hill was prescribed medication for his AFIB and was advised to "drastically lower his alcohol intake to prevent further deterioration of his health status."  Doc. 8-8 at 16.  Hill underwent a heart catheterization on March 3, 2019, after which it was recommended that his cardiac issues be managed with medication.  Doc. 8-8 at 50–51.  On March 4, 2019, Hill had a follow-up at which the severity of his alcohol use was discussed; he declined professional help.  Doc. 8-12 at 15.

From August 2019 until September 2021, Hill saw a chiropractor roughly every one to two months with low back pain of moderate intensity for which he received regular adjustments.  Doc. 8-13 at 38–66.  Over the course of his treatment, he showed some improvement.  Doc. 8-13 at 38–66.

On November 20, 2019, Hill was referred to Substance Use Disorder Clinical Care (SUDCC) by military command after he was found slumped over his desk at work due to alcohol intoxication.  Doc. 8-9 at 65.  He was prescribed Naltrexone to help curb his alcohol cravings.  Doc. 8-9 at 65.

Between November 2019 and May 2020, Hill attended 22 group therapy

sessions and 3 individual therapy sessions at SUDCC.  Doc. 8-9 at 65–66.  During his individual therapy sessions with a psychiatrist, Dr. Gauri Jain, Hill reported that he was "doing ok" or "good" and that Paxil helped his mood; he had no evidence of major depression or PTSD.  Doc. 8-9 at 126–27; Doc. 8-10 at 90–91, 149–50.  He had generally normal mental status examinations.  Doc. 8-9 at 130–31; Doc. 8-10 at 94–95, 151–52.  At his final SUDCC session, Hill was diagnosed with severe alcohol use disorder in full early remission but had a "guarded" prognosis, and treatment notes indicated that he "did no more than he had to" during the course of treatment, refused to attend AA meetings, and had no support system; however, he was released as a "success" with 5 months of complete abstinence from alcohol.  Doc. 8-9 at 66.

On August 20, 2020, Hill saw a nurse practitioner, Kimberly Self, to establish care for his conditions, including AFIB, hypertension, diabetes, anxiety, and gout.  Doc. 8-12 at 128.  His AFIB, diabetes, and gout were well controlled with medication.  Doc. 8-12 at 128.  His anxiety was doing well on Paxil.  Doc. 8-12 at 128.  He reported drinking 4 to 5 days per week and his blood pressure was "a little high."  Doc. 8-12 at 128.  His physical examination was normal.  Doc. 8-12 at 129.

On September 29, 2020, Dereka Hill (Hill's wife) filled out a third-party drug and alcohol use questionnaire, stating that Hill drank a pint of vodka per day and 2 to 3 beers per day, that it took him 2 to 3 days to recover after using alcohol, and that he had blackouts from drinking.  Doc. 8-7 at 20.  She stated that Hill slept 18 to 24

7

hours per day, he could not do anything, and he was "very destructive." Doc. 8-7 at 21.

Also on September 29, 2020, Dereka filled out a third-party function report. Doc. 8-7 at 41–48. Dereka stated that she lived in a house with Hill, and that he was physically weak and unable to lift things or stand for long. Doc. 8-7 at 41. She stated that she took care of Hill and their animals, though Hill did feed and water their dogs. Doc. 8-7 at 42. She stated that Hill could not walk long distances or lift items, but had no problems with personal care and could make his own quick meals—though he never did due to "laziness." Doc. 8-7 at 42–43. She stated that Hill did laundry and mowed the grass with a riding mower for half of the day once per week. Doc. 8-7 at 43. She stated that Hill was able to drive, to shop in stores once or twice per week for several hours, and to handle money. Doc. 8-7 at 44. She stated that his hobbies included television, sports, and fishing. Doc. 8-7 at 45. Dereka stated that Hill was able to socialize, but typically only went to his mother's house or to Walmart. Doc. 8-7 at 45. She stated that his impairments affected his ability to lift, squat, bend, stand, walk, kneel, climb stairs, and see, and that he could no longer lift things and could "only walk a few feet." Doc. 8-7 at 46. Dereka stated that Hill did not handle stress or changes in routine well. Doc. 8-7 at 47.

On October 2, 2020, Hill filled out a drug and alcohol use questionnaire. Doc. 8-7 at 39. Hill stated that he drank a pint of vodka 4 days per week, that it took him

8

a "couple of days" to recover, and that he did not have blackouts.  Doc. 8-7 at 39.

He stated that his drinking affected his ability to function and caused problems with

his ability to socialize.  Doc. 8-7 at 39–40.

Also on October 2, 2020, Hill filled out an adult function report.  Doc. 8-7 at

22–29.  Hill stated that he lived in a house with his wife and had gout, arthritis, and

pain that was "crippling on certain days."  Doc. 8-7 at 22.  He said that from waking

up until he went to bed, he just watched television.  Doc. 8-7 at 23.  He stated that

he cared for his mother when she needed him and took care of 5 dogs.  Doc. 8-7 at

23.  He stated that he had no problem with personal care and prepared quick meals

"above daily."  Doc. 8-7 at 23–24.  Hill stated that he did laundry and mowed the

grass on a riding mower once per week.  Doc. 8-7 at 24.  He stated that he could

drive a car and shop for groceries for about an hour per week and could handle

money.  Doc. 8-7 at 25.  Hill stated that he planned to start fishing as a hobby,

socialized with friends about twice per month, and visited his mother.  Doc. 8-3 at

26.  Hill stated that his impairments affected his ability to lift, squat, bend, kneel,

climb stairs, complete tasks, and follow instructions, and that his knees, hips, and

lower back were weak and painful.  Doc. 8-7 at 27.  He stated that he could walk

half of a mile before needing a 5-minute rest, could pay attention for 30 minutes, had

trouble following instructions and getting along with authority figures as he got

older, and handled stress and changes in routine "ok."  Doc. 8-7 at 27–28.  He stated

that his medications caused no side effects.  Doc. 8-7 at 29.

On November 30, 2020, Hill saw nurse a practitioner, Kimberly Self, for a follow-up appointment.  Doc. 8-12 at 125.  His conditions were controlled with medication and he was tolerating his medications well.  Doc. 8-12 at 125.  His anxiety was "doing well with current medications."  Doc. 8-12 at 125.  His examination was normal.  Doc. 8-12 at 126.

On December 3, 2020, Hill had a psychological evaluation with a psychologist, Mary Arnold.  Doc. 8-12 at 142.  Dr. Arnold noted that Hill chose not to see a psychiatrist, that his drinking habits had returned to the same amount of vodka consumption as prior to his time at SUDCC, and that he felt the evaluation appointment was "unnecessary."  Doc. 8-12 at 142.  Hill denied using mental health services.  Doc. 8-12 at 142.  Hill stated that he was able to fulfill his office duties "even with the consumption of a pint of vodka the night before."  Doc. 8-12 at 143.

Dr. Arnold noted that Hill walked with an upright military gait, moved and gestured without obvious impairment, was well groomed and dressed, and had appropriate speech and behavior.  Doc. 8-12 at 143.  His mood was stable with a calm affect.  Doc. 8-12 at 143.  Dr. Arnold stated that Hill did activities of daily living, including visiting his mother regularly and doing errands like shopping.  Doc. 8-12 at 144.  Hill told Dr. Arnold that he was "building a workshop in [his] garage," did "a little bit of fishing," had a good friend named Kenny, and had rescued 5 dogs

with his wife.  Doc. 8-12 at 144.  Dr. Arnold stated that Hill did not use the evaluation "appointment time in his own best interest, since he finds it unnecessary."  Doc. 8-12 at 144.  The only diagnosis made by Dr. Arnold was "alcohol abuse."  Doc. 8-12 at 144.

On December 12, 2020, Hill had a consultative examination with a nurse practitioner, Ashley Wagner.  Doc. 8-13 at 3–8.  Wagner noted that Hill presented with "complaints that his worsening chronic conditions such as but not limited to" hypertension, arthritis, anxiety, and back pain prevented him from completing activities that he used to be able to do, such as jogging.  Doc. 8-13 at 4.  Wagner noted under "functional status" that Hill had "difficulty sitting greater [than] 1 hour due to back pain," had "difficulty standing greater than 1 hour due to worsening back and leg pain," and had "no difficulty" walking.  Doc. 8-13 at 4.  Wagner noted that Hill's acute complaints were back pain, leg pain, anxiety, depression, and PTSD.  Doc. 8-13 at 4.  Hill's vision without correction was 20/20 in his right eye and 20/40 in his left eye.  Doc. 8-13 at 4.  He appeared well groomed, alert, oriented, and in no acute distress.  Doc. 8-13 at 4.  Hill was cooperative, well developed, well nourished, and responded adequately to questions and commands.  Doc. 8-13 at 4.  An ear, nose, and throat examination was normal, and he could hear and respond to normal conversation.  Doc. 8-13 at 5.  His breath was normal.  Doc. 8-13 at 5.  Cardiovascular signs were normal.  Doc. 8-13 at 5.  He had no paraspinal muscle

tenderness.  Doc. 8-13 at 5.  Hill had normal strength in all extremities and normal grip and was able to pinch, grab, and manipulate.  Doc. 8-13 at 5.  He had normal sensory examination and normal reflexes.  Doc. 8-13 at 5–6.  He had no difficulty getting on and off the examination table, but could not walk on his heels or walk on his toes and had "great difficulty" squatting and rising.  Doc. 8-13 at 6.  Wagner noted that Hill had abnormal gait and station due to pain with an antalgic gait.  Doc. 8-13 at 6.  Hill's range of motion was normal.  Doc. 8-13 at 7–8.  Wagner assessed Hill as having anxiety, depression, hypertension, and diabetes.  Doc. 8-13 at 8.

Wagner provided a medical source statement, in which she stated that, based on her examination, Hill was "unable to complete work related activities that require frequent standing, lifting, pushing, pulling due to worsening chronic conditions, frequent evaluation is recommended."  Doc. 8-13 at 8.  Wagner also recommended psychiatric evaluation due to Hill's history of alcohol abuse.  Doc. 8-13 at 8.

On March 1, 2021, Hill saw a nurse practitioner, Kimberly Self, for a follow-up for hypertension, AFIB, diabetes, and anxiety.  Doc. 8-13 at 87.  He was tolerating his medication without side effects and his conditions were controlled with his medications.  Doc. 8-13 at 87.  His anxiety was noted as "controlled with Paxil"; his anxiety had increased the prior month, but then had calmed back down.  Doc. 8-13 at 87.  He declined an increased dosage of Paxil.  Doc. 8-13 at 87.

On May 21, 2021, Hill saw a nurse practitioner, Kimberly Self, for a follow-

up.  Doc. 8-13 at 84.  Hill reported that he had recently voluntarily committed himself to a rehab facility for alcoholism and was 70 days sober.  Doc. 8-13 at 84.  He was doing well on his medications and did not want to take preventative medication for gout symptoms.  Doc. 8-13 at 84.

On July 27, 2021, Hill saw a nurse practitioner, Kimberly Self, for a follow-up.  Doc. 8-13 at 81.  His conditions were managed well with medication and he was not experiencing side effects.  Doc. 8-13 at 81.  His anxiety was "doing well on current medications" and he was attending AA meetings.  Doc. 8-13 at 81.  Hill was not interested in seeing a psychiatrist.  Doc. 8-13 at 81.

On September 30, 2021, Hill saw a nurse practitioner, Kimberly Self, for a follow-up.  Doc. 8-13 at 77.  He requested a referral to an eye doctor because of visual changes.  Doc. 8-13 at 76.  Hill requested a prescription for Xanax or buspirone for his anxiety to take only at night and wanted a prescription for Mobic to take "sometimes" for arthritis in his knees and feet.  Doc. 8-13 at 76.  Self wrote prescriptions for the requested medications.  Doc. 8-13 at 77.

On October 25, 2021, Hill saw a nurse practitioner, Kimberly Self, for a follow-up.  Doc. 8-13 at 74.  His conditions were mostly well managed with medication (with the exception of hyperlipemia) and he was not experiencing side effects.  Doc. 8-13 at 73.  Hill reported that he thought Mobic was helping his joint pain.  Doc. 8-13 at 73.

On December 17, 2021, Hill saw nurse practitioner, Kimberly Self, for a follow-up.  Doc. 8-13 at 70.  His conditions were well managed with medication and he was not having any side effects.  Doc. 8-13 at 70.  He was "taking Mobic rarely for joint pain" and was doing "well."  Doc. 8-13 at 70.  His anxiety was stable with medication.  Doc. 8-13 at 70.

### B.    Social Security proceedings

### 1.    Initial application and denial of benefits

In August 2020, Hill filed an application for disability benefits with an alleged onset date of March 30, 2020, based on alleged impairments of alcoholism, diabetes type 2, lower lumbar arthritis, gout, high blood pressure, high cholesterol, depression, PTSD, and anxiety.  Doc. 8-4 at 3, 26; Doc. 8-6 at 2.

On January 8, 2021, Hill's application for benefits was denied at the initial level based on a finding that he could perform light work.  Doc. 8-4 at 2–26.

On March 12, 2021, Hill requested reconsideration of the initial denial of benefits.  Doc. 8-5 at 15.  On July 1, 2021, Hill's application was denied on reconsideration, in part based on a finding that he had, at most, mild mental limitations, and based on a finding that he could perform light work.  Doc. 8-4 at 27–37.

On July 27, 2021, Hill requested a hearing before an ALJ.  Doc. 8-5 at 21.

### 2.    ALJ hearing

On May 5, 2022, the ALJ conducted a telephonic hearing to determine whether Hill was disabled.  Doc. 8-3 at 48–50.

Hill's counsel stated that Hill had been unable to work since the alleged onset date of March 30, 2020, because of low back pain and ankle pain due to arthritis and gout that limited his mobility and made it painful to walk, stand, and sit for extended periods of time.  Doc. 8-3 at 52–53.  Counsel stated that Hill also suffered from mental health issues, including anxiety that was treated with medication but that made it hard to focus and stay on task.  Doc. 8-3 at 53.

Hill testified that he was married, had two grown children, and lived in a house with his wife.  Doc. 8-3 at 54–55.  He stated that he had received 100% disability from the Veteran's Administration (VA).  Doc. 8-3 at 55.  Hill testified that he was able to drive.  Doc. 8-3 at 55.  Hill testified that he had previously worked in logistics for the Army National Guard and was honorably discharged.  Doc. 8-3 at 56.  Hill testified that he was encouraged to see a civilian psychiatrist but chose not to do so. Doc. 8-3 at 57.

The ALJ noted that the record did not show that Hill suffered from PTSD, but Hill stated that he did have PTSD from his tour of duty in Iraq.  Doc. 8-3 at 58–59; *see also* Doc. 8-3 at 57 ("You put PTSD on your application, but I saw zero treatment from the VA or any mentions of PTSD in your file.").  Hill confirmed that he had

stopped working after he had alcohol issues at work in November 2019.  Doc. 8-3 at

59.  He testified that he had received treatment at the VA for alcohol issues, and that

he had last had a drink 4 weeks before the hearing.  Doc. 8-3 at 59.  He testified that

his alcohol issues were "not near as bad" as they had been previously.  Doc. 8-3 at

59.  Hill testified that he chose not to see a psychiatrist because he did not "care

about talking about [himself]" and about reliving his time in the military and because

he does not "trust psychiatrists."  Doc. 8-3 at 60.  The ALJ asked Hill about his

consultative examination with Dr. Arnold and Hill replied that "[s]he was dull and

dry as can be" and that "[s]he was not interested in being there and I certainly wasn't

either."  Doc. 8-3 at 60.

Hill testified that he left the military on a medical discharge that was not solely

because of his alcohol issues, but because of "just everything that added up."  Doc.

8-3 at 61–62.  Hill testified that, during an average day, he could only sit in an office

chair for about 15 minutes per hour, then he had to stand up for about 30 minutes

and walk around.  Doc. 8-3 at 63.  He testified that he does not "care for people

much" because they are "untrustworthy."  Doc. 8-3 at 63.  He stated that he does not

"like to be talked down to," that he is "set in [his] ways," and that he does not like

"drama" that causes him anxiety.  Doc. 8-3 at 64–65.  He testified that he was not

able to be around groups of people, and that he really only socialized when he went

to see his mother "a couple times a week."  Doc. 8-3 at 65.  Hill said he saw a

chiropractor once per month who worked on his neck, lower back, and ankles. Doc. 8-3 at 66.

A vocational expert (VE), Robert Bond, testified that a hypothetical individual with Hill's age, education, past work experience, transferable skills, and the limitations described by the ALJ would be able to perform Hill's past work as a logistics administrator, but not if the hypothetical individual could not perform jobs with a specific production rate and required occasional supervision. Doc. 8-3 at 66–69.

### 3.    ALJ decision

On May 17, 2022, the ALJ entered an unfavorable decision. Doc. 8-3 at 23–42. The ALJ found after "careful consideration of all the evidence" that Hill "is under a disability, but that a substance use disorder is a contributing factor material to the determination of disability," and consequently that Hill "has not been disabled under the Social Security Act at any time from the alleged onset date through the date of this decision." Doc. 8-3 at 27.

In the decision, the ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 404.1520(a); *Winschel*, 631 F.3d at 1178). Doc. 8-3 at 27–28. The ALJ noted that the ALJ would consider whether there was medical evidence of a substance use disorder, and, if so, "if the substance use disorder(s) is a contributing factor material to the determination of disability" because, if so, the claimant would

not be disabled (*see* 20 C.F.R. § 404.1535).  Doc. 8-3 at 28.

The ALJ found that Hill had not engaged in substantial gainful activity since March 30, 2020, the alleged onset date.  Doc. 8-3 at 28.  The ALJ found that, including his substance abuse, Hill had severe impairments of "obesity, degenerative disc disease, gout, alcohol use disorder, and atrial fibrillation."  Doc. 8-3 at 28.  In finding Hill's severe impairments, the ALJ provided a detailed summary of Hill's medical records from 2019 through December 2021, including his consultative examinations with Mary Arnold and Ashley Wagner.  Doc. 8-3 at 29–32.

In summarizing Wagner's consultative examination, the ALJ found that Hill had alleged worsening chronic conditions including hypertension, arthritis, depression, anxiety, and back pain that prevented him from completing daily activities that he could once complete, and alleged difficulty sitting or standing for more than an hour and walking.  Doc. 8-3 at 30.  The ALJ found that, during Wagner's examination, Hill was cooperative and adequately responded to commands, had normal hearing, had normal breath sounds, had regular heart rate and rhythm, had no paraspinal tenderness, had 5/5 strength in upper and lower extremities, could pinch, grab, and manipulate, had a normal sensory examination, had no difficulty getting on and off the examination table, was unable to walk on his heels or toes, had great difficulty squatting and rising, had abnormal gait and station due to pain, and had normal range of motion in his cervical and lumbar spine.  Doc.

8-3 at 31.

The ALJ found that Wagner assessed Hill with anxiety, depression, hypertension, and diabetes, and that Wagner opined that Hill could not complete work related activities requiring frequent standing, lifting, pushing, and pulling due to worsening chronic conditions.  Doc. 8-3 at 31.

The ALJ found that Hill had nonsevere impairments of hypertension, hyperlipidemia, diabetes mellitus, cataracts, glaucoma, loss of central vision acuity, kidney stones, tinnitus, sleep related breathing disorder, anxiety, and depression. Doc. 8-3 at 32–33.  The ALJ found that Hill's anxiety and depression did not cause more than minimal work related limitations because Hill had "several normal mental status examinations in the treatment records," as well as several treatment visits at which he had "no observable psychiatric symptoms."  Doc. 8-3 at 33.  The ALJ also found that the record showed that medication was effective in controlling the symptoms of Hill's anxiety and depression, that Dr. Arnold found alcohol abuse to be Hill's only psychological impairment, and that he was able to perform his activities of daily living.  Doc. 8-3 at 33.

The ALJ found that, even with his substance abuse, Hill did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations.  Doc. 8-3 at 33–34.  In considering Hill's mental impairments, including

substance use disorder, the ALJ found that Hill had only mild limitation in understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace.  Doc. 8-3 at 34–35.  The ALJ found that, including his substance use disorder, Hill had moderate limitation in adapting or managing himself.  Doc. 8-3 at 35.

The ALJ determined Hill's RFC, finding that, including his substance use, Hill had the capacity to perform "light work" as defined in the applicable regulations, except that Hill could never climb ladders, ropes, or scaffolds, could frequently stoop, could occasionally kneel, crouch, or crawl, could have no exposure to excessive vibration, could occasionally be exposed to extreme temperatures, could never be exposed to hazards such as moving mechanical parts and high exposed places, could understand, remember, and carry out complex instructions, required occasional supervision throughout the work period, and could not perform work requiring a specific production rate or hourly quotas.  Doc. 8-3 at 35–36.

In making the RFC finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," according to the requirements of 20 C.F.R. § 404.1529 and SSR (Social Security Ruling) 16-3p.  Doc. 8-3 at 36.  The ALJ also stated that the ALJ had considered the medical opinions and prior administrative medical findings.  Doc. 8-3 at 36.

In finding Hill's RFC and the extent to which Hill's symptoms limited his function, the ALJ's decision stated that the ALJ followed the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to function." Doc. 8-3 at 36.

The ALJ summarized Hill's testimony about his background and noted that Hill had been medically discharged from the military because of alcohol use and chose not to see a psychiatrist for alcohol abuse. Doc. 8-3 at 36. The ALJ found that Hill alleged that he could only sit for 15 minutes per hour, did not like being around others, did not trust people, and did not like "being talked down to." Doc. 8-3 at 36. The ALJ found that Hill saw his mother "a couple of times per week" and went to a chiropractor once per month for pain in his back, neck, and ankles. Doc. 8-3 at 36.

After "considering the evidence of record," the ALJ found that Hill's "medically determinable impairments could reasonably be expected to produce some of the alleged symptoms," and that his statements about the intensity, persistence, and limiting effects of the symptoms were generally consistent with the record when substance use was considered. Doc. 8-3 at 36.

The ALJ found that Hill alleged problems with sitting, lifting, squatting, bending, kneeling, and climbing stairs related to pain and weakness in his knees, hips, and lower back, but his allegations of significant physical limitations were not consistent with the record showing that he could complete his activities of daily living.  Doc. 8-3 at 36.  The ALJ went on to find that the alleged limitations were not consistent with the fact that Hill reported that he could "do laundry, use a riding lawnmower, drive, fish, run errands, and handle his personal care," and build a workshop in his garage.  Doc. 8-3 at 36–37.

The ALJ found that, while Hill had been treated for degenerative disc disease and gout, he had normal strength and range of motion during his consultative examination with Ashley Wagner.  Doc. 8-3 at 37.

The ALJ also found that, although Hill could not perform walking on his heels and toes during his examination with Wagner and had "great difficulty squatting and rising" during that examination, his activities of daily living did not indicate significant problems with ambulation and his performance during the examination with Wagner was "not consistent with most treatment records describing his balance and gait as normal."  Doc. 8-3 at 37.

The ALJ found that the record showed that treatment had been effective for Hill's pain because he reported that Mobic helped his joint pain and he only took it rarely, and the chiropractor helped his reported mild to moderate pain.  Doc. 8-3 at

37.

As a result, the ALJ found that the "objective findings, the reports regarding his retained abilities, and the reports regarding the effectiveness of his treatment do not support the level of limitation alleged by the claimant or a finding that he has disabling physical limitations." Doc. 8-3 at 37.

The ALJ found that Hill's atrial fibrillation was stable and controlled and was not disabling. Doc. 8-3 at 37. The ALJ considered Hill's obesity and factored it into the RFC. Doc. 8-3 at 37.

The ALJ found that, based on Hill's "physical impairments and [Hill's] allegations discussed above," the ALJ had "reduced [Hill] to a light level of exertion with the postural and environmental limitations" in the RFC. Doc. 8-3 at 37. The ALJ found that the "objective findings including range of motion and strength findings noted previously, [Hill's] reports regarding the effectiveness of his treatment, and his activities of daily living discussed above" supported a finding of an RFC allowing light work with additional limitations. Doc. 8-3 at 37–38.

The ALJ found that Hill's anxiety and depression did not cause more than minimal limitations, but stated that his alcohol abuse interfered with his recreational activities and exacerbated his anxiety. Doc. 8-3 at 38.

The ALJ found that Dr. Arnold opined that Hill's alcohol abuse was a severe impairment, that Hill reported drinking a pint of vodka per day, and that Hill required

occasional supervision because of possible intoxication and could not do work requiring a production quota.  Doc. 8-3 at 38.  The ALJ found that Hill's reports that he could pay bills, shop, and drive, along with normal mental status examinations, supported a finding that Hill could understand, remember, and carry out complex instructions.  Doc. 8-3 at 38.

The ALJ then stated that the ALJ had considered the medical opinions and prior administrative medical findings in the record in accordance with 20 C.F.R. § 404.1520(c).  Doc. 8-3 at 38.  The ALJ stated that the ALJ rarely found opinions merely persuasive or not persuasive because the ALJ had the benefit of the entirety of the record.  Doc. 8-3 at 38.

The ALJ found the opinions of the state agency consultants regarding Hill's physical limitations "mostly persuasive" because they were adequately explained and supported by normal range of motion and strength findings (including in Wagner's examination) and because they were consistent with Hill's reported daily activities.  Doc. 8-3 at 38.  The ALJ found that minor discrepancies in the opinions merited a reduction to light work.  Doc. 8-3 at 38.

The ALJ also found the opinions regarding Hill's mental limitations—i.e., only mild limitation from anxiety and depression—were mostly persuasive, and the ALJ included limitations considering the effects of Hill's history of alcohol abuse.  Doc. 8-3 at 38.

The ALJ found the evaluation of Dr. Arnold only mildly persuasive because Hill did not cooperate, so the examination was not complete.  Doc. 8-3 at 39.  However, the ALJ still "consider[ed] the entire examination along with all evidence in the record in making this determination."  Doc. 8-3 at 39.

In considering Ashley Wagner's opinion, the ALJ found that Wagner was a qualified medical source with training, experience, and disability program knowledge.  Doc. 8-3 at 39.  The ALJ found that Wagner "did include range of motion studies and noted symptoms from the claimant, but included a vague statement that 'Patient is unable to complete work related activities that require frequent standing, lifting, pushing, pulling due to worsening chronic conditions.'"  Doc. 8-3 at 39.  The ALJ then found that Wagner's "report and conclusions are somewhat lacking in functional limitations," and the ALJ found Wagner's opinion "only moderately persuasive."  Doc. 8-3 at 39.

The ALJ also stated that the ALJ had "considered the objective findings and compared them with the other available evidence in determining" Hill's RFC.  Doc. 8-3 at 39.  The ALJ then found that, "[a]s discussed above, the indication that [Hill] had some problems walking on heels, walking on toes, and squatting is not supported by the claimant's activities and is not entirely consistent with the rest of the treatment record."  Doc. 8-3 at 39.

The ALJ stated that the ALJ had reviewed the third-party function report

completed by Hill's wife.  Doc. 8-3 at 39.  The ALJ also stated that the ALJ had reviewed and considered other evidence in the record.  Doc. 8-3 at 39.

The ALJ found that, with his substance abuse, Hill could not perform any past relevant work.  Doc. 8-3 at 39.  The ALJ also found that, considering Hill's age, education, work experience, and RFC based on his impairments including his substance abuse, no jobs existed in significant numbers in the national economy that Hill could perform.  Doc. 8-3 at 40.

The ALJ found that if Hill "stopped the substance abuse," then he would still have severe impairments that caused more than a minimal impact on his ability to work, but would not have an impairment or combination of impairments that met or equaled any of the impairments listed in the regulations.  Doc. 8-3 at 40.

The ALJ found that, if Hill stopped the substance use, he would have the RFC to perform light work except he could never climb ladders, ropes, or scaffolds, could frequently stoop, could occasionally kneel, crouch, or crawl, could have no exposure to excessive vibration, could occasionally be exposed to extreme temperatures, and could never be exposed to workplace hazards such as moving mechanical parts and high exposed places.  Doc. 8-3 at 41.

The ALJ found that Hill's anxiety and depression did not cause more than minimal work related limitations, and consequently that no mental limitations were included in the RFC finding—in the absence of substance abuse.  Doc. 8-3 at 41.

The ALJ found further that Hill's physical impairments were reflected in the RFC finding, and that there was no indication that stopping substance abuse would cause any change in Hill's physical impairments or any change in Hill's physical limitations.  Doc. 8-3 at 41.

The ALJ found that, if Hill stopped substance abuse, he would be able to perform his past relevant work as a logistics administrator.  Doc. 8-3 at 41.  As a result, the ALJ found that substance use disorder was a contributing factor material to the determination of disability, because Hill would not be disabled if he stopped substance abuse.  Doc. 8-3 at 41.  Thus, because substance abuse was a contributing factor material to the determination of disability, the ALJ found that Hill had "not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision."  Doc. 8-3 at 42.

### 4.   Appeals Council decision

Hill sought review from the SSA Appeals Council of the ALJ's denial of benefits.  Doc. 8-3 at 21–22.  On July 15, 2022, the Appeals Council denied the request for review, finding no reason to review the ALJ's May 17, 2022 decision.  Doc. 8-3 at 5.  Because the Appeals Council found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that

the ALJ's decision was supported by substantial evidence and based on proper legal standards.

## I.   The ALJ evaluated the opinion of the consultative nurse practitioner, Ashley Wagner, according to the proper legal standards, and substantial evidence supported the ALJ's decision to find Wagner's opinion only moderately persuasive.

The ALJ evaluated the opinion of the consultative nurse practitioner, Ashley Wagner, according to the proper legal standards, and the ALJ's finding that Wagner's opinion was only moderately persuasive was supported by substantial evidence.  In his briefing, Hill argues that the ALJ's partial rejection of Wagner's opinion was erroneous because the ALJ failed to adequately explain the supportability of Wagner's opinion based on her consultative examination findings. Doc. 15 at 19–22.  Hill argues further that the ALJ also failed to adequately explain the consistency of Wagner's opinion with the rest of the record.  Doc. 15 at 22–28.

The SSA has revised its regulations on the consideration of medical opinions for all claims filed on or after March 27, 2017—like the claim in this case.  Under those revised regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including the opinion of a treating or examining physician.  20 C.F.R. § 404.1520c(a).  And the Eleventh Circuit has ruled that the SSA's new regulations validly abrogated the so-called "treating-physician rule," such that an ALJ no longer is required to defer to the medical opinion of a treating physician.  *See Harner v. Social Sec. Admin.,*

*Comm'r*, 38 F.4th 892 (11th Cir. 2022).

Instead, the ALJ considers the persuasiveness of a medical opinion according to the following five factors:  (1) supportability; (2) consistency; (3) the relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) other factors, including evidence showing that the medical source has familiarity with other evidence or an understanding of the SSA's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(c).

Supportability and consistency are the most important factors, and the ALJ must explain how the ALJ considered those factors.  20 C.F.R. § 404.1520c(b)(2). "Supportability" requires an ALJ to consider that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  "Consistency" requires an ALJ to consider that "[t]he more consistent a medical opinion[] or prior administrative medical finding[] is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] or prior administrative medical finding[] will be."  20 C.F.R. § 404.1520c(c)(2).  The ALJ may explain how the ALJ considered the other factors, but the ALJ is not required to do so.  20 C.F.R.

§ 404.1520c(b)(2).

Moreover, a "statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine" that the claimant is "disabled."  20 C.F.R. § 404.1527(d)(1).  That is because opinions about whether a claimant is disabled, the claimant's "residual functional capacity" (RFC), and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  Any such statement from a treating physician may be relevant to the ALJ's findings but is not determinative, because it is the ALJ who must find the claimant's RFC.  *See, e.g.*, 20 C.F.R. § 404.1546(c).

Here, the ALJ's decision shows that the ALJ properly applied the new, revised regulations and considered and explained the lack of complete supportability and consistency before partially rejecting Wagner's opinion.   With respect to supportability, the ALJ found that Wagner "did include range of motion studies and noted symptoms from the claimant," but that Wagner "included a vague summary statement that 'Patient is unable to complete work related activities that require frequent standing, lifting, pushing, pulling due to worsening chronic conditions,'" and that Wagner's "report and conclusions are somewhat lacking in functional limitations."  Doc. 8-3 at 39.  And, with respect to consistency, the ALJ stated that the ALJ had "considered the objective findings and compared them with the other

available evidence in determining" Hill's RFC; the ALJ found that, "[a]s discussed above [in the ALJ's decision]," the indication that [Hill] had some problems walking on heels, walking on toes, and squatting is not supported by the claimant's activities and is not entirely consistent with the rest of the treatment record." Doc. 8-3 at 39 (citing exhibits). While the ALJ's decision perhaps could have been more clear in this regard, the decision nevertheless does "provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted." *See, e.g.*, *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991) ("The Secretary's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."). Review of the ALJ's decision demonstrates that the ALJ conducted the necessary "internal check" (supportability) and "external check" (consistency), and no more was required under the regulations. *See* Doc. 15 at 18, 20.

Indeed, the ALJ's decision confirms that the ALJ adequately considered and explained the supportability and consistency factors with regard to Wagner's opinion. *See, e.g., Pariseau v. Commissioner of Soc. Sec.*, No. 2:20-CV-01224-JHE, 2022 WL 4277295, at *7 (N.D. Ala. Sept. 15, 2022) (noting that an ALJ's supportability and consistency assessment can consider medical records discussed elsewhere in the decision); *Agan v. Kijakaz*, No. 4:22-CV-00368-RDP, 2023 WL

5193468, at *9 (N.D. Ala. Aug. 11, 2023) ("An ALJ may refer to evidence discussed elsewhere in the decision when evaluating medical opinions or prior administrative findings.").   In finding Hill's severe impairments at step two of the sequential analysis, the ALJ included an exhaustive summary of Wagner's examination, setting forth all of the mostly normal findings—including that Hill had no paraspinal tenderness, normal strength, and normal range of motion.  Doc. 8-3 at 30–31.

Further, in determining Hill's RFC, the ALJ found that, while Hill had "been treated for degenerative disc disease and gout," Wagner noted Hill "to have normal strength and a normal range of motion throughout [his] physical consultative examination."  Doc. 8-3 at 37.  The ALJ found that Hill "could not perform walking on heels or walking on toes" during Wagner's examination, and that Wagner noted Hill "to have great difficulty squatting and rising," but that Hill's "activities of daily living discussed above" in the ALJ's decision did not show that Hill had "significant problems with ambulation," and that his performance during Wagner's examination was "not consistent with most treatment records describing his balance and gait as normal."  Doc. 8-3 at 37 (citing exhibits).  The ALJ also found that the record evidence indicated that Hill's treatment had "been effective at treating his pain symptoms," that Hill "told treatment providers that Mobic works well for his joint pain and that he has to take it only rarely," that Hill "mostly only reported mild to moderate pain to his chiropractor and also indicated that this treatment was effective

at reducing his pain," and consequently that the "objective findings, the reports regarding his retained abilities, and the reports regarding the effectiveness of his treatment d[id] not support the level of limitation alleged by [Hill] or a finding that he has disabling physical limitations." Doc. 8-3 at 37. And, in assessing the opinions of the state agency consultants, the ALJ relied on Wagner's normal strength and range of motion findings. Doc. 8-3 at 38.

In addition, while this court cannot "reweigh the evidence" (*Winschel*, 631 F.3d at 1178), substantial evidence supported the ALJ's evaluation of Wagner's opinion according to the supportability and consistency factors, as well as the ALJ's finding that the opinion was only moderately persuasive. As an initial matter, the ALJ did not find Wagner's opinion entirely unpersuasive, but instead found it "moderately persuasive." Doc. 8-3 at 39. Partially in line with Wagner's opinion, the ALJ included in Hill's RFC the limitations that Hill could only perform light work with additional postural and environmental limitations, including never climbing, and could only occasionally kneel, crouch, or crawl. Doc. 8-3 at 35–38.

Wagner opined in her medical source statement that Hill was "unable to complete work related activities that require frequent standing, lifting, pushing, pulling due to worsening chronic conditions, frequent evaluation is recommended." Doc. 8-13 at 8. During the examination on which the opinion was based, Wagner noted that Hill had difficulty sitting for more than an hour due to back pain, had

difficulty standing more than an hour due to back and leg pain, had no difficulty walking, had normal strength and grip, had no trouble getting on and off the examination table, could not walk on his toes or his heels, had "great difficulty" with squatting and rising, had antalgic gait, and had normal range of motion.  Doc. 8-13 at 4–8.  With respect to supportability, Wagner's examination notes show no clear basis for the finding that Hill had difficulty sitting or standing for more than an hour.  Doc. 8-13 at 4.  Wagner's notes from Hill's physical examination were mostly normal, including normal range of motion, strength, and reflexes, good appearance, cooperation, and understanding, and no paraspinal tenderness.  Doc. 8-13 at 4–6.  While Wagner noted that Hill could not walk on his heels or toes, had difficulty squatting, and had an antalgic gait, she also noted that he had "no difficulty" walking and that he had no difficulty getting on and off the examination table.  Doc. 8-13 at 4, 6.  These apparent disconnects—if not internal contradictions—between the mostly normal examination findings and Wagner's opinion that Hill could not "complete work related activities that require frequent standing, lifting, pushing, pulling due to worsening chronic conditions" (Doc. 8-13 at 8) show that there was substantial evidence for the ALJ's finding that Wagner's opinion was "vague" and "somewhat lacking in functional limitations," and consequently neither entirely persuasive nor internally supported by Wagner's own examination.  Doc. 8-3 at 39.

Likewise, with respect to consistency, the rest of the record also provides

evidence conflicting with the work related limitations expressed in Wagner's opinion. For instance, the record shows that Hill received chiropractic treatment for moderate back pain and improved with treatment. *See* Doc. 8-13 at 38–66. Hill also did not report disabling levels of pain in his appointments with Kimberly Self. Doc. 8-12 at 125–26, 128–29; Doc. 8-13 at 76, 81, 84, 87. In fact, Hill requested Mobic to take only "sometimes" for his joint pain (Doc. 8-13 at 76), and then reported that it helped and that he only took it "rarely" (Doc. 8-13 at 70, 73, 76). Mary Arnold noted that Hill walked with upright military gait and moved without obvious impairment. Doc. 8-12 at 143. Function reports from both Hill and his wife, Dereka, showed that Hill was able to complete many activities of daily living, including caring for their dogs, personal care, making meals, doing laundry, mowing the grass on a riding mower, driving, shopping in stores for hours, and fishing. Doc. 8-7 at 23–26, 42–45. Dr. Arnold noted that Hill completed those activities of daily living and was also building a workshop in his garage. Doc. 8-12 at 144. As the ALJ found, Hill could "do laundry, use a riding lawnmower, drive, fish, run errands, and handle his personal care," and build a workshop in his garage. Doc. 8-3 at 36–37. All of this record evidence is inconsistent with the work related limitations as to which Wagner opined, and shows that there was substantial evidence for the ALJ's finding that Wagner's opinion was not entirely persuasive and not consistent with the record.

In sum, both Wagner's own examination and the other record evidence shows that Hill had largely normal abilities and activities that were contrary to the work related limitations in Wagner's opinion.  As such, a "reasonable person would accept" the evidence that the ALJ reviewed as "adequate to support [the] conclusion" that Wagner's opinion was not internally supported by her consultative examination or consistent with the other evidence in the record.  *See Crawford*, 363 F.3d at 1158. Consequently, the ALJ did not err in finding that Wagner's opinion was not entirely persuasive; and, in light of the substantial evidence supporting that finding, the court cannot disturb that finding even if the evidence were to preponderate against the finding.  *See Crawford*, 363 F.3d at 1158.

## II. Substantial evidence supported the ALJ's RFC finding with regard to Hill's substance abuse and mental abilities, and the ALJ did not fail to adequately develop the record.

Substantial evidence supported the ALJ's RFC finding with regard to Hill's substance abuse and mental abilities, and the ALJ did not fail to adequately develop the record.  In briefing, Hill argues that the ALJ failed to adequately "develop the record necessary to separate the impact of Plaintiff's substance abuse on his ability to perform work related activities from that of [Hill's] mental health impairments," and that the ALJ should have ordered another consultative examination.  Doc. 15 at 34.  Hill argues that the ALJ's determination that Hill's substance use disorder was a contributing factor material to his disability determination was erroneous because

the determination was not "supported by any psychological interpretation of the medical evidence within the record," as the record only had medical opinion evidence on the issues from the state consultants and the consultative examiner, Mary Arnold, none of which the ALJ found completely persuasive. Doc. 15 at 35–39. Hill argues that the ALJ impermissibly relied on his own layperson interpretation of raw medical data. Doc. 15 at 39.

An ALJ "has a basic duty to develop a full and fair record." *Henry v. Commissioner of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015). By statute, the Commissioner must "develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability." 42 U.S.C. § 423(d)(5)(B). Applicable regulations further clarify that the Commissioner has the responsibility to "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which [the claimant] file[s] [his] application unless there is a reason to believe that development of an earlier period is necessary or unless [the claimant] say[s] that [his] disability began less than 12 months before [he] filed [his] application." 20 C.F.R. § 404.1512(b)(1).

An ALJ also can order a consultative examination. 20 C.F.R. § 404.1512(b)(3). The ALJ "has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains

sufficient evidence for the [ALJ] to make an informed decision." *Ingram v. Commissioner of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007).

So, while the ALJ does have the "basic duty to develop a full and fair record" (*Henry*, 802 F.3d at 1267), the claimant ultimately "bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *see also* 20 C.F.R. § 404.1512(a) ("[I]n general, you have to prove to us that you are . . . disabled.  You must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled.").   And, notwithstanding the ALJ's responsibility to develop a "full and fair" record, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded." *Graham v. Apfel*, 129 F.3d 1420, 1422–23 (11th Cir. 1997).  The Eleventh Circuit has instructed that "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Graham*, 129 F.3d at 1423 (quotation marks omitted).

Here, the record was fully and fairly developed.  Pursuant to the applicable regulations, if the Commissioner finds that a claimant is disabled and has medical evidence of the claimant's drug addiction or alcoholism, the Commissioner "must determine whether [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability."  20 C.F.R. § 404.1535(a).  In

making that determination, the "key factor" is whether the Commissioner would "still find [the claimant] disabled if [the claimant] stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1).  The record before the ALJ was adequate to make an informed decision as to that determination.  *Ingram*, 496 F.3d at 1269.

The record before the ALJ contained extensive records of Hill's medical treatment extending beyond a year before his filing date of August 2020 and his alleged onset date of March 30, 2020.  *See* 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(b)(1); *see also, e.g.*, Doc. 8-12 at 61, 65 (records from March 2018); Doc. 8-8 at 8–14 (records from March 2019).  The record also contained medical records both from Hill's visits to his primary care provider after his alleged onset date (*see, e.g.*, Doc. 8-12 at 125–26, 128–29; Doc. 8-13 at 81, 84, 87), and from his time at SUDCC undergoing treatment for alcohol abuse (*see, e.g.*, Doc. 8-9 at 65–66, 126–27; Doc. 8-10 at 90–91, 149–50).  The ALJ also had records from the consulting examinations of both Ashley Wagner and Mary Arnold.  Doc. 8-13 at 3–8; Doc. 8-12 at 142–144.  Wagner recommended psychiatric evaluation based on Hill's history of alcohol abuse (Doc. 8-13 at 8), while Dr. Arnold performed a psychiatric evaluation and found that Hill's only diagnosis was alcohol abuse (Doc. 8-12 at 144).

Hill does not argue that any records from his medical history were missing, but instead argues that the ALJ should have further developed the record and ordered

*more* medical opinion evidence.  Doc. 15 at 37–39.  But in light of the extensive medical evidence in the record, the ALJ did not need to order another consultative examination or rely on a particular physician opinion in determining any mental limitations in Hill's RFC considering his alcohol use; Hill's medical record is replete with well founded evidence of Hill's alcohol abuse, including hospital records advising him to reduce his alcohol consumption (Doc. 8-8 at 16), records from his SUDCC treatment for alcohol abuse (Doc. 8-9 at 65–66), alcohol use questionnaires from Hill and his wife (Doc. 8-7 at 20–21, 39–40), Dr. Arnold's psychological diagnosis of alcohol abuse (Doc. 8-12 at 144), and a record from Kimberly Self noting that Hill had been to rehab for alcoholism (Doc. 8-13 at 84).

Aside from Hill's alcohol use, the ALJ considered Hill's mental limitations in finding Hill's severe impairments at step two of the sequential analysis.  Doc. 8-3 at 33.  The ALJ found that "the record does not support a finding that [Hill's] anxiety and depression cause [him] more than minimal work-related limitations," that "[t]here are several normal mental status examinations in the treatment records and several treatment visits during which [Hill] had no observable psychiatric symptoms," that "the record indicates that his treatment is effective at controlling his symptoms," that "[h]is anxiety was described as doing well, as being controlled, and as being stable with treatment," that "Dr. Arnold found alcohol abuse to be the only psychological impairment," that Hill had "been able to perform his activities of

40

daily living and indicated specifically that he can pay his bills, handle his personal care, and handle changes in his routine despite his anxiety and depression." Doc. 8-3 at 33. As a result, the ALJ found that "[t]he objective findings and indication that his anxiety is controlled with treatment, the findings of Dr. Arnold, and [Hill's] reported activities of daily living do not support a finding that his anxiety and depression cause more than minimal work-related limitations," and that Hill's "anxiety and depression do not cause more than mild limitations." Doc. 8-3 at 33.

Consistent with these findings, in determining Hill's RFC, the ALJ then found that Hill's "anxiety and depression do not cause more than minimal work-related activities," but that Hill's "alcohol abuse was described as interfering with his recreational activities and as exacerbating his anxiety." Doc. 8-3 at 38.

Consequently, in determining Hill's RFC, if he stopped the substance abuse, the ALJ found that Hill's "anxiety and depression do not cause more than minimal work-related limitations," and that "no mental limitations [were] included in this residual functional capacity in the absence of substance abuse." Doc. 8-3 at 41. The ALJ accounted for Hill's "physical impairments by limiting [him] to a range of light work," finding that there was "no indication that stopping substance abuse would cause any change in [Hill's] physical impairments or any change in his physical limitations." Doc. 8-3 at 41.

Substantial evidence supported the ALJ's findings regarding Hill's substance

abuse and mental abilities, and there was no need or reason to order another consultative examination.  The record provided ample evidence regarding Hill's mental health conditions and lack of debilitating symptoms aside from alcohol abuse such that there were no evidentiary gaps that the ALJ was required to fill.  *See Graham*, 129 F.3d 1422–23.   Among other things (as discussed above), during his time at SUDCC, Hill reported that Paxil helped his mood, had generally normal mental status examinations, and did not exhibit symptoms of major depression or PTSD.  Doc. 8-9 at 126–31; Doc. 8-10 at 90–95, 149–52.  During his primary care appointments with Self, the record shows multiple occasions where Hill's anxiety was controlled with medication and he did not present with any debilitating mental health symptoms.  Doc. 8-12 at 125, 128; Doc. 8-13 at 70, 73, 77, 81, 84.  Further, Hill's function reports and hearing testimony focused primarily on his physical issues, and any mental issues seemed to be attributable to a general dislike of people as he aged.  Doc. 8-7 at 22–29, 41–48.  Dr. Arnold found alcohol abuse to be Hill's only serious mental health issue.  Doc. 8-12 at 143.  Multiple places throughout the record show also that Hill's mental health symptoms were not so severe that he felt the need to seek psychiatric treatment.  Doc. 8-3 at 57; Doc. 8-12 at 142; Doc. 8-13 at 81.  Accordingly, the amount of medical evidence in the record was sufficient for the ALJ to consider Hill's alcohol use and mental health conditions and to make an informed decision regarding Hill's RFC.  *See Ingram*, 496 F.3d at 1269.

Moreover, the ALJ's consideration of the clear evidence and diagnoses of substance abuse did not constitute an "unfounded hunch" that the ALJ substituted for the diagnosis of a medical professional. *See Malone v. Saul*, No. 3:18-CV-554-ECM, 2019 WL 6307209, at *4 (M.D. Ala. Nov. 22, 2019) (quotation marks omitted); Doc. 15 at 38. Rather, the ALJ considered the record, including the medical records, and made a finding regarding the effects of Hill's substance abuse on his mental abilities. Hill argues that the ALJ erred because "there is no medical opinion determining that [Hill's] substance abuse was a contributing factor material to the determination of disability" (Doc. 17 at 6), but the determination of the effect of medical issues on a finding of disability falls within the purview of the ALJ; opinions about whether a claimant is disabled, the claimant's "residual functional capacity" (RFC), and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner." *Dyer*, 395 F.3d at 1210. In other words, the "task of determining a claimant's residual functional capacity and ability to work rests with the [ALJ], not a doctor." *Moore v. Social Sec. Admin., Comm'r*, 649 F. App'x 941, 945 (11th Cir. 2016); *see also* 20 C.F.R. § 404.1546(c) ("If your case is at the [ALJ] hearing level . . . , the [ALJ] . . . is responsible for assessing your residual functional capacity.").

Nor could there be the required showing of prejudice regarding any further development of the record; there could be no fact-based argument about how any

hypothetical, additional development of the record would have changed the ALJ's RFC finding regarding Hill's substance abuse and mental health issues.  Hill does not present any specific evidentiary gaps that the ALJ failed to fill, but instead argues broadly that the ALJ simply did not consider enough opinion evidence.  Doc. 15 at 28–42.  Yet Hill has not provided any reason to believe that another opinion would have conflicted with the evidence in the record that Hill suffered from alcohol abuse that contributed to his disability, and that his anxiety and depression otherwise did not cause more than minimal work related limitations.  *See generally* Doc. 15; Doc. 17.  As such, Hill has identified no evidentiary gaps in the record resulting in "unfairness or clear prejudice," and there is no basis for reversal due to any supposed failure to develop the record.  *See Graham*, 129 F.3d 1422–23.

In sum, substantial evidence supported the ALJ's RFC findings with regard to Hill's mental abilities (with and without substance use), and the ALJ's duty to develop the record did not require the ALJ to order an additional consultative examination or to otherwise develop the record further.  *See Ellison*, 355 F.3d at 1276; 20 C.F.R. § 404.1512(a).

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court **AFFIRMS** the Commissioner's decision.  The court separately will enter final

judgment.

> **DONE** and **ORDERED** this March 28, 2024.

_____

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE